The order below is hereby signed.

Signed: November 22 2023



Elizabeth L. Gunn
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | Case No. 21-00041-ELG |
| **Matthew Edward Shkor,**<br>**Debtor.** | **Chapter 7** |
| **Capital Bank, N.A.,**<br>**Plaintiff,** | |
| **v.** | **Adv. Pro. No. 21-10012** |
| **Cornerstone Capital, LLC,** *et al.*,<br>**Defendants.** | |

## <u>MEMORANDUM DECISION</u>

This case requires the Court to determine the relative priority of two creditors' liens on the Debtor's ("Mr. Shkor") property located at 1738 R St., NW, Washington, D.C. 20009 (the "Property"). In February 2023, the Court held a two-day bench trial (the "Trial") on the matter. At the conclusion of the Trial the Court took the matter under advisement. Upon consideration of the evidence, the applicable case law, the pleadings, and the arguments presented at Trial, the Court concludes that Capital Bank has a first priority lien in the Property in the principal amount of $1,583,473.95 plus 5 percent interest beginning April 16, 2018. This Memorandum Opinion sets for the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.    Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The parties have consented to the entry of a final order by this Court. *See* Notice of Removal at ¶ 26, ECF No. 1; Def.'s Bankr. R. 9027(e)(3) Statement, ECF No. 15. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

## II.    Background

### a.    *Land Records*

At its core, this case is a lien priority dispute between two lenders with secured interests in the Property owned by Mr. Shkor. The parties do not dispute the validity of the recorded documents in this case. Mr. Shkor lives and works as a property developer in the Washington, D.C. area. On April 28, 2017, Mr. Shkor purchased the Property and entered into a loan agreement wherein Capital Bank, N.A. ("Capital Bank") loaned Mr. Shkor $4,050,000 (the "2017 Capital Bank Loan") secured by a first position deed of trust recorded on May 1, 2017 (the "2017 Capital Bank Lien"). Stip. Facts at 1, ECF No. 72. The 2017 Capital Bank Loan had an initial loan term of 6 months and an interest rate of LIBOR plus 4.5 percent, with a minimum rate of 5.75 percent. Ex. 1, ECF No. 75–1.

On or about May 26, 2017, Cornerstone Capital, LLC ("Cornerstone") loaned $1,262,500 to two limited liability companies affiliated with Mr. Shkor—Potomac Construction 1753 Willard, LLC and Potomac Construction Biltmore, LLC (together, the "Potomac Entities")—for which Mr. Shkor concurrently provided a personal guaranty of payment and performance (collectively, the "2017 Cornerstone Loan"). Ex. 2, ECF No. 75–2. The 2017 Cornerstone Loan was secured by a

second deed of trust on the Property recorded on June 23, 2017 (the "2017 Cornerstone Lien") and

two executed but unrecorded deeds of trust on properties owned by certain of Mr. Shkor's other

limited liability companies, specifically, 1753 Willard Street N.W., Washington D.C. and 1900

Biltmore Street N.W., Washington D.C. (the "Willard Property" and "Biltmore Property,"

respectively). Ex. B, ECF No. 75–14.

On April 16, 2018, Mr. Shkor refinanced the 2017 Capital Bank Loan from the $4,050,000

loan to a $2,000,000 home equity credit line loan with an initial term of 10 years and a balloon

payment due at the end (the "2018 Capital Bank Loan") secured by a deed of trust recorded on

April 24, 2018 (the "2018 Capital Bank Lien" and with the 2018 Capital Bank Loan, the "2018

Capital Bank Refinance"). Stip. Facts at 2, ECF No. 72. After the completion of the 2018 Capital

Bank Refinance, on July 26, 2018, Capital Bank released the 2017 Capital Bank Lien. Ex. 9, ECF

No. 75–9. The 2018 Capital Bank Loan remains unpaid and was scheduled by Mr. Shkor in his

bankruptcy with a balance due of over $2 million. Schedule D, Line 2.1, *In re Shkor*, No. 21-

00041-ELG (Bankr. D.D.C. Feb. 5, 2021), ECF 1.

The 2018 Capital Bank Loan is an interest only loan with an adjustable interest rate varying

from 4.75 percent to 24 percent. Exs. 1 and 11, ECF Nos. 75–2 and 75–12. The interest rate on

Capital Bank's refinance loan was 5 percent at the time of the loan. Ex. 11 at 2, ECF No. 75–11.

The 2018 Capital Bank Loan paid off the outstanding balance of the 2017 Capital Bank Loan, with

additional net proceeds of $394,948.58 ("Net Proceeds"). Ex. 8, ECF No. 75–8. At the time of the

2018 Capital Bank Refinance, instead of retaining the Net Proceeds, Mr. Shkor assigned them to

Cornerstone. Ex. 8 at 4, ECF No. 75–8. The Net Proceeds were wired to Cornerstone on or about

April 25, 2018. As a result, the balance of the 2017 Cornerstone Loan was reduced by $394,948.58,

leaving an outstanding balance of $408,884.89 (the "Cornerstone Paydown," collectively with the

2018 Capital Bank Refinance and the Net Proceeds, the "2018 Transaction"). Tr. Hr'g Feb. 7, 2023 at 224:3–8; Am. Comp. ¶ 50, ECF No. 18.

Cornerstone applied the Cornerstone Paydown towards the 2017 Cornerstone Loan, but due to the outstanding balance, did not release the 2017 Cornerstone Lien. Capital Bank believed that through its refinance of the 2017 Capital Bank Loan into the 2018 Capital Bank Loan it would retain a first position lien on the Property through either a release or subordination of the 2017 Cornerstone Lien. However, neither a release nor a subordination agreement was signed by Cornerstone or obtained in the course of the 2018 Transaction. As a result, the land records of the District of Columbia show the following consensual liens on the Property (as relevant herein), in order of priority: 2017 Cornerstone Lien (June 23, 2017) and 2018 Capital Bank Lien (April 24, 2018). The issue before the Court is whether there is a legal or equitable reason to modify the priorities as they exist in the land records.

> b.      *Refinance Transaction*

The recorded documents only comprise a portion of the relevant facts in this case. The 2017 Capital Bank Loan and 2017 Cornerstone Loan are not in dispute. However, the facts and circumstances around the 2018 Capital Bank Refinance are central to the question before the Court. As part of 2018 Capital Bank Refinance, Capital Bank retained Standard Title Group, LLC ("Standard Title") as the settlement agent. On February 28, 2018, Standard Title caused to be issued an ALTA Commitment for Title Insurance (the "Title Commitment") from Old Republic National Title Insurance Company ("Old Republic"). The Title Commitment included a satisfaction and/or release of the 2017 Cornerstone Lien as a requirement for completing the transaction in paragraph 9 of Schedule B. Ex. 6 at 6, ECF No. 75–6. After closing, Old Republic issued a title policy for the 2018 Capital Bank Loan in which there was no exception from coverage

for the 2017 Cornerstone Lien. Ex. 7, ECF No. 75–7. Capital Bank relied upon these facts in its

belief that after the 2018 Transaction the 2018 Capital Bank Lien was in first position. However,

despite the requirement and the lack of exception, the 2017 Cornerstone Lien was not released or

satisfied as part of the 2018 Capital Bank Refinance, resulting in a promotion to first position.

Contrary to the terms of the Title Commitment, on April 13, 2018, just prior to closing

Capital Bank issued to Standard Title a closing instruction letter for the issuance of a title policy

requiring a search of the District of Columbia land records to "assure [Capital Bank] of a second

priority lien" on the Property (the "Closing Letter"). Ex. 5, ECF No. 75–5. Capital Bank asserts

that the statement was a scrivener's error and introduced both the testimony of Kathy Yamada, the

corporate representative for Capital Bank, and internal documents from Capital Bank supporting

Ms. Yamada's testimony that it was always the intention for Capital Bank to retain a first position

lien priority on the Property after the 2018 Transaction. Tr. Hr'g Feb. 7, 2023 at 114:19–21; Tr.

Hr'g Feb. 7, 2023 at 119:17–19. The Court finds Ms. Yamada credible and that all the relevant

written evidence, except for the Closing Letter, supports the conclusion that Capital Bank intended

to be in first position after the 2018 Capital Bank Refinance, and the Closing Letter's reference to

a second position was an unintended scrivener's error. Capital Bank did not independently confirm

that the 2017 Cornerstone Lien had been released following the 2018 Transaction, instead relying

on Standard Title and the corresponding Title Commitment and Title Policy.

Under the terms of the Title Commitment, Standard Title was responsible for obtaining or

confirming the satisfaction or release of the 2017 Cornerstone Lien prior to the completion of the

2018 Capital Bank Refinance. Ex. 6, ECF No. 75–6. Standard Title was primarily represented in

the transaction by its owner Kevin Anderson. At Trial, Mr. Anderson conceded that prior to

completion of the 2018 Transaction he never received a written release or any other written

confirmation of any agreement by Cornerstone to release its lien. Tr. Hr'g Feb 7, 2023 at 77:11–14. However, he proceeded to close the transaction based upon a verbal conversation with a co-managing member of Cornerstone ("Mr. Schuman") during which a verbal representation was made that the 2017 Cornerstone Lien would be released or subordinated. Contrary to Mr. Anderson's testimony, in his testimony Mr. Schuman personally and on behalf of Cornerstone denied the existence of any verbal representation or agreement by Cornerstone to release or subordinate the 2017 Cornerstone Lien as part of the 2018 Transaction without payment in full. Tr. Hr'g Feb. 7, 2023 at 193:14–194:6.

The issue of whether Cornerstone was requested to, or actually did consent to a subordination or release of the 2017 Cornerstone Lien is further complicated by an email from Mr. Shkor to Mr. Schuman on April 10, 2018 (approximately a week before the 2018 Transaction). In that email, Mr. Shkor wrote:

> I would request that I be allowed to complete [the] Capital [Bank] refi, 100% proceeds going to pay down the line, and pay the delta off from sales. You are still significantly secured, and the line will be reduced by 400k so I think you would be confident in the position.

Ex. 12 at 3, ECF No. 75–12 (the "Shkor Email Language"). Cornerstone asserts that the Shkor Email Language was only part of a larger proposal with Cornerstone on how to satisfy the terms of the 2017 Cornerstone Loan that was due to mature on April 30, 2018,[1] including the reduction (i.e., "pay down") of Mr. Shkor's obligation to Cornerstone, but not a proposal for a release of the 2017 Cornerstone Lien without payment in full. Mr. Shkor's testimony at Trial was consistent with that interpretation; however, the Court does not find Mr. Shkor to be a credible witness on this point and does not provide any weight to his testimony. Alternatively, Capital Bank argues that

---

[1] On January 18, 2018, Cornerstone and the Potomac Entities entered into a *Modification of Promissory Note*, which extended the maturity date of the original 2017 Cornerstone Loan through and including April 30, 2018. Stip. Ex. C, ECF No. 75-15.

the Shkor Email Language represents a request from Mr. Shkor to Cornerstone to accept the Net Proceeds of the 2018 Capital Bank Refinance in exchange of a satisfaction/release of the 2017 Cornerstone Lien so that Capital Bank would retain first position as required to "complete the Capital Bank refi."

The Court finds that the Shkor Email Language and balance of the email exchange admitted therewith does establish that Mr. Shkor sought to cause the 2018 Capital Bank Refinance to close on the terms required by Capital Bank and approached Cornerstone with respect to the same. As a result, the Shkor Email Language further supports the fact that Mr. Shkor knew there would be insufficient proceeds from the 2018 Capital Bank Refinance to pay Cornerstone in full, and that Cornerstone would either need to subordinate or release its lien in order for the 2018 Capital Bank Refinance to close. Specifically, the phrase "I would request that I be allowed to complete" the 2018 Capital Bank Refinance is indicative of this fact. It is plausible that the balance of the language is Mr. Shkor requesting a release based upon the Cornerstone Paydown, but the balance of the email exchange between the parties does not further clarify this point. There is nothing in the email exchange indicating that Cornerstone ever accepted the proposal, despite the ultimate closing of the 2018 Capital Bank Refinance. Based upon a consideration of the totality of the written evidence and testimony, the Court finds that the Shkor Email Language is insufficient to support Capital Bank's argument that Cornerstone agreed to release or subordinate its lien. Conversely, the Court finds that Mr. Anderson and Standard Title operated outside the scope of the Title Commitment Letter in completing the 2018 Capital Bank Refinance without a written subordination agreement or release of the 2017 Cornerstone Lien.

### c.   *Cornerstone's Further Loans to Shkor*

After the completion of the 2018 Transaction, and despite the maturity of the 2017 Cornerstone Loan on April 30, 2018, the Potomac Entities and Cornerstone (with the Potomac Entities, the "Cornerstone Loan Parties") entered into a second modification of the 2017 Cornerstone Loan on July 19, 2018 to extend the maturity date through October 19, 2018. Ex. D at 2, ECF No. 75–16. Just over one month later, on August 29, 2018, the Cornerstone Loan Parties agreed to another modification of the 2017 Cornerstone Loan (also titled the Second Modification), this time both extending the maturity date through February 28, 2019 and increasing the loan amount by $756,000 to a total of $1,164,884.89. Ex. E[2] at 2, ECF No. 75–17. Then, on February 26, 2019, the Cornerstone Loan Parties again agreed to a modification of the 2017 Cornerstone Loan to extend the maturity date through August 31, 2019 and increase the total amount by $1,000,000 for a total balance of $2,193,882.88.[3] Ex. F at 2, ECF No. 75–18. Mr. Shkor, as owner of the Potomac Entities and guarantor to Cornerstone, was a direct beneficiary of each modification.

Despite being termed "modifications", the security for Cornerstone's loan(s) to the Potomac Entities changed over time. The January 2018 and July 2018 modifications recite security in the Property as well as recorded deeds of trust on the Potomac Entities' properties on Willard Street and Biltmore Street. Ex. C, ECF No. 75–15; Ex. D, ECF No. 75–16. As conceded at Trial, despite the note reflecting that the Willard Property and the Biltmore Property deeds of trust were recorded, they were never recorded in the land records. Tr. Hr'g Feb. 7, 2023 at 178:15–179:7.

---

[2] The title of Exhibit E–Second Modification of Promissory Note–contains a scrivener's error. This was the third modification as stated in the first line of the document. Tr. Hr'g Feb. 7, 2023 at 234:12

[3] Although not directly relevant herein, the Court notes that with each modification Cornerstone was paid or authorized to withhold from future disbursements multiple fees, including Loan Extension Fees ($26,875.00, $15,000.00, $56,000.00, $70,000.00) and its legal fees and internal accounting fees ($468.75, $656.25, $5,750, $7,000.00) totaling at least $181,750.00.

The August 2018 modification removed the Biltmore Property from its list of security but retained both the Property and the (inaccurately designated as recorded) deed of trust on the Willard Property. By the February 2019 modification, the only security listed was the Property. Cornerstone relied upon its post-2018 Capital Bank Refinance lien position on the Property as part of its business calculation in approving each modification with the Potomac Entities. By the time the foreclosure action was filed, Cornerstone alleged a balance due from the Potomac Entities of $2,193,882.88. *See* Am. Compl. ¶ 38, ECF No. 18 (principal balance as of February 2019).

> d.      *The Superior Court Action*

Despite the 2018 Transaction occurring in April 2018, Capital Bank did not discover the continued existence of the prior in time 2017 Cornerstone Lien until December 2020 when Cornerstone initiated foreclosure proceedings on the Property. To halt the foreclosure, on January 5, 2021, Capital Bank filed a complaint and motion for a temporary restraining order in the Superior Court for the District of Columbia (the "Superior Court")[4] seeking a declaratory judgment to determine the priority of the liens on the Property. The Superior Court action was removed to this Court after Mr. Shkor filed his bankruptcy petition initiating this Adversary Proceeding. Capital Bank filed an *Amended Complaint to Determine Priority of Liens* (the "Amended Complaint") on June 17, 2021,[5] modifying the relief requested to include relief under Bankruptcy Rule 7001(2), for the Court to determine the validity, priority, or extent of the liens of Capital Bank and Cornerstone on the Property.[6]

---

[4] *Capital Bank, N.A. v. Cornerstone Capital, LLC*, Case No. 2021-CA-000021-B (D.C. Super. Ct. Jan. 5, 2021).

[5] The Amended Complaint was itself amended to cure certain filing deficiencies. *See* ECF No. 18. Citations to the Amended Complaint are to ECF No. 18.

[6] Although not referenced in the Amended Complaint, the Court has the authority to enter a declaratory judgment in an action brought under Bankruptcy Rule 7001(2) pursuant to Bankruptcy Rule 7001(9).

*e.    Witness Credibility*

Due to the nature of the dispute, the Court may consider parol evidence including the testimony of parties involved in the 2018 Capital Bank Refinance. The Court heard testimony from each of the key parties in this case: Kevin Anderson (both in his capacity as owner of Standard Title and individually), Mr. Shkor, the corporate representative of Capital Bank Kathy Yamada, Mark Schuman (both as a corporate representative for Cornerstone and individually), and expert in real estate closings in the District of Columbia Earl Wise.

As is set forth above, Kevin Anderson did not simply own Standard Title and serve as the closing agent (and notary on many documents) for the 2018 Capital Bank Refinance. He served as the notary on the 2017 Cornerstone Lien as well as the 2019 modification to the 2017 Cornerstone Loan. Mr. Anderson additionally personally engaged in business with Mr. Shkor and his entities. Tr. Hr'g Feb. 7, 2023 at 35:12–14. Upon the discovery that the 2017 Cornerstone Lien was not released, Mr. Anderson was contacted by Capital Bank. Shortly thereafter he also exchanged emails with Mr. Shkor about the transaction where he asked Mr. Shkor if there was any "written communication from Cornerstone" acknowledging the release. Ex. K at 2, ECF No. 75–23. The record is replete with examples of contradictory and self-serving testimony and/or statements by Mr. Anderson that result in the Court giving little credibility to his testimony at Trial. The same is true of Mr. Shkor. The record reflects numerous contradictory statements by Mr. Shkor surrounding the 2018 Transaction, including those statements contained in various discovery responses and other court filings, and the Court gives little credibility to most of his testimony as to the 2018 Transaction. The Court finds the testimony of the remaining witnesses—Kathy Yamada, Mark Schuman, and Earl Wise—credible.

      *f.*      *Mr. Shkor's Bankruptcy Filing*

On February 5, 2021, Mr. Shkor filed a voluntary petition under chapter 7. Ch. 7 Vol. Petition, *In re Shkor*, No. 21-0041-ELG (Bankr. D.D.C. Feb. 5, 2021), ECF No. 1. The Superior Court case was subsequently removed to this Court in May 2021, and Capital Bank voluntarily withdrew the motion for a temporary restraining order. Notice of Removal, ECF No. 1. The Amended Complaint filed on June 17, 2021 seeks a declaratory judgment that the 2018 Capital Bank Lien is superior to the 2017 Cornerstone Lien either: (a) in full, due to Cornerstone's agreement to release and/or subordinate its deed of trust as part of the 2018 Transaction; (b) in full through the subrogation of the lien on equitable grounds under the doctrine of replacement of mortgages; or (c) in part through the subrogation of the lien relating to the modifications in July 2018, August 2018, and February 2019, all of which were made after the recording of the 2018 Capital Bank Lien. Am. Comp. at 10, ECF No. 18.

In February 2022, Capital Bank and Cornerstone filed cross-motions for summary judgment. ECF Nos. 47 and 49. On September 1, 2022, the Court granted Capital Bank's motion in part, holding that the doctrine of replacement of mortgages applies in the District of Columbia, but denied the balance of the motions, finding that there were genuine issues of material fact. Order at 12, ECF No. 65. Trial in this matter was held on February 7 and 8, 2023. During Trial, Capital Bank clarified that the relief requested under the doctrine of replacement of mortgages was limited to the outstanding balance on the 2017 Capital Bank Loan at the time of the 2018 Capital Bank Refinance plus five percent interest, with the balance maintaining a second lien position.

### III.      Discussion

   *a)      Declaratory Judgment*

A declaratory judgment "shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201. In the District of Columbia, courts often rely on two criterions for a declaratory judgment: "whether the judgment will serve a useful purpose in clarifying the legal relations at issue" and "whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn v. Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016); *see, e.g.*, *Hashemite Kingdom of Jordan v. Layale Enters. (In re B-727 Aircraft)*, 272 F.3d 264, 270 (5th Cir. 2001); *U.S. Bank Nat'l Ass'n v. State Bank & Trust Co.*, 45 F. Supp. 3d 582, 591 n.4 (S.D. Miss. 2014). The party seeking a declaratory judgment must prove their case by a preponderance of the evidence. *See, e.g.*, *In re Thompson*, 177 B.R. 443, 450 (Bankr. E.D.N.Y. 1995). Although pled in a single count, the Amended Complaint raises three primary bases upon which Capital Bank alleges it is entitled to a declaratory judgment: 1) Cornerstone agreed to subordinate to the 2018 Capital Bank Lien; 2) Capital Bank is entitled to retain its first position under the doctrine of replacement of mortgages for the portion of the debt identified at Trial; and 3) in part as to the post-2018 Capital Bank Lien recordation modifications by Cornerstone.

   *b)      Agreement to Subordinate*

In the Amended Complaint, Capital Bank asserted that Cornerstone agreed to release the 2017 Cornerstone Lien in exchange for the assignment and receipt of the Net Proceeds from Mr. Shkor. Am. Comp. ¶ 46, ECF No. 18. The only evidence in support of this position at Trial was the testimony of Mr. Anderson, which was directly contradicted by Cornerstone's representative

and Mr. Shkor.[7] *See* Tr. Hr'g Feb. 7, 2023 at 50:11–23; Tr. Hr'g Feb. 7, 2023 at 109:8–17; Tr. Hr'g Feb. 7, 2023 at 144:14–24. Capital Bank further attempts to rely on the Shkor Email Language. However, the Court finds that the Shkor Email Language is insufficient to show any agreement between Mr. Shkor and Cornerstone. Thus, the Court finds that Capital Bank has failed to show by a preponderance of the evidence that Cornerstone agreed to subordinate or release its lien as part of the 2018 Transaction and a declaratory judgment on that basis is denied.

  c)      *The Doctrine of Replacement of Mortgages*

Finding that the evidence insufficient grant judgment on the basis that Cornerstone agreed to subordinate, the Court next turns to whether Capital Bank is entitled to relief under the doctrine of replacement of mortgages. As this Court previously held in this case, the doctrine of replacement of mortgages allows a lender that refinances its own lien to retain a senior lien priority if they show that

> [A] senior mortgage is released of record and, as part of the same transaction, is replaced with a new mortgage, the latter mortgage retains the same priority as its predecessor, except to the extent that any change in the terms of the mortgage or the obligation it secures is materially prejudicial to the holder of a junior interest in the real estate.

*Capital Bank, N.A. v. Cornerstone Capital, LLC (In re Shkor)*, 644 B.R. 410, 416 (Bankr. D.D.C. 2022) (quoting Restatement (Third) of Property: Mortgages, § 7.3 (1997) [hereinafter Restatement]). Thus, to demonstrate entitlement to relief under the doctrine, a party seeking relief must show that:

  (1)      The party paid off and refinanced the original mortgage as part of the same transaction;
  (2)      As part of the transaction a senior mortgage was released of record and replaced with a new mortgage of record; and
  (3)      The change in the terms of the new mortgage was not materially prejudicial to the holder of a junior interest.

---

[7] As noted above, the Court provides little weight to Mr. Shkor's testimony.

The final element may alternatively be stated as a requirement that granting a replacement of mortgages would not work any injustice on the rights of junior interest holders.

In this case, it is clear and undisputed that the first two elements of the test are met as part of the 2018 Capital Bank Refinance. The 2017 Capital Bank Loan was paid off and refinanced by the 2018 Capital Bank Loan. As part of the 2018 Transaction, the 2017 Capital Bank Lien was released of record and replaced with the 2018 Capital Bank Lien. Capital Bank's entitlement to relief under the doctrine of replacement of mortgages thus depends on whether the change in terms of the 2018 Capital Bank Lien are materially prejudicial to Cornerstone.

As a threshold matter, the Court must determine the applicable point in time for determination of material prejudice, either (i) the facts and circumstances as of the date of the transaction in question; or (ii) all events from the date of the transaction through the date of the requested relief. Neither the language of the doctrine in the Restatement nor the reported cases adopting the doctrine address the timing of analysis of the question of material prejudice. However, the timing of analysis has been evaluated by courts in connection with the related doctrine of equitable subrogation, and whether relief under that doctrine "would not work any injustice to the rights of others." *E. Sav. Bank, FSB v. Pappas*, 829 A.2d 953, 961 (D.C. 2003). Although not explicitly stated in either opinion, both the District of Columbia Court of Appeals and the Circuit Court for the District of Columbia evaluated the question of prejudice to the junior lienholder at the time of the transaction giving rise to equitable subrogation. *See Pappas*, 829 A.2d at 961 (". . . subrogation would work no injustice to the [junior lienholder], who retain the precise security interest that they possessed at the time [of the transaction]"; *Smith v. First Am. Title Ins. Co. (In re Stevenson)*, 789 F.3d 197, 202–03 (D.C. 2015) (evaluating right to equitable subrogation of plaintiff based on the facts at the time of the transaction). Utilizing the time of transaction does not

prejudice a junior/intervening lienor who claims a benefit without any consideration from them and solely from the mistake of the senior lienor. *See Pappas*, 829 A.2d at 960 (quoting *Burgoon v. Lavezzo*, 92 F.2d 726 (D.C. 1937)).

In support of its allegations of prejudice, Cornerstone introduced extensive evidence at Trial regarding post-2018 Capital Bank Refinance transactions and modifications between Cornerstone and the Potomac Entities. However, such transactions are not relevant to the Court's analysis of whether the 2018 Capital Bank Refinance itself, at the time of the transaction, resulted in a material prejudice to Cornerstone. Thus, similar to the analysis in *Pappas*, when considering the third element of the doctrine of replacement of mortgages in this case, the Court must analyze whether any of the modifications to the terms from the 2017 Capital Bank Loan and 2017 Capital Bank Lien to the 2018 Capital Bank Lien and 2018 Capital Bank Loan resulted in material prejudice to Cornerstone.

As noted by a comment to the Restatement, parties frequently agree to a variety of modifications to mortgages and/or the obligations they secure, including, but not limited to extension of maturity dates, changes in interest rates, or a change in the principal amount of the mortgage. Restatement, cmt. a. A change in the terms of a mortgage or the underlying obligation is not *per se* materially prejudicial to the junior lienor, instead, a court must examine the facts and circumstances. *See* Restatement, cmt. b. In this case, the 2018 Capital Bank Loan modified the principal balance, interest rate, loan term, and type of loan from the 2017 Capital Bank Loan. The Court will address the potentially prejudicial nature of each of these modifications in turn.

i)      *Principal Balance*

Although the $2,000,000 face amount of the 2018 Capital Bank Loan is less than the original $4,050,000 face amount of the 2017 Capital Bank Loan, at the time of the 2018 Capital

Bank Refinance the outstanding balance of the 2017 Capital Bank Loan (i.e., the value of the lien superior to Cornerstone) was only $1,605,051.42. Thus, the 2018 Capital Bank Loan increased the principal amount owed to Capital Bank, which on its own would be prejudicial to Cornerstone. Restatement, cmt. b (an "increase in the principal amount will prejudice the holder of junior interests"). However, if the junior lienholder is subrogated only to the extent of the payoff of the senior lienor's mortgage at the time of the transaction, then there is no resulting prejudice. *See E. Sav. Bank, FSB v. Pappas*, 829 A.2d 953, 960 (D.C. 2003); *see also Cont'l Lighting & Contr., Inc. v. Premier Grading & Utils., LLC*, 258 P.3d 200, 205 (Ariz. Ct. App. 2011) (applying replacement of mortgages to the extent of the payoff of the original mortgage). Therefore, if Capital Bank were allowed to subordinate Cornerstone to the current balance of its debt, there would be prejudice to Cornerstone. Capital Bank does not request such relief, instead requesting subordination of Cornerstone only to the extent of its payoff at the time of the 2018 Capital Bank Refinance, with the balance of any obligation remaining in a second lien position. Therefore, there is no prejudice to Cornerstone as a result of the change in principal of the 2018 Capital Bank Loan.

ii)     *Change in Interest Rate*

The 2017 Capital Bank Loan had an interest rate of LIBOR plus 4.5 percent with a minimum rate of 5.75 percent. In contrast, the 2018 Capital Bank Loan has a variable interest rate between 4.75 percent and 24 percent but was 5 percent at the time of the loan. An increased interest rate can be materially prejudicial to the extent that the "junior interest-holder's margin of protection in the real estate is reduced." Restatement, cmt. b. Similar to the discussion as to the increased face principal balance, there would be prejudice if Capital Bank were seeking interest at a rate higher than the 2017 Capital Bank Loan. However, Capital Bank is only requesting interest

on the subordinated portion of the loan at 5 percent, a modification that results not in prejudice, but a benefit to Cornerstone by a minimum of 0.75 percent.

    *iii)*    *Term of the Loan*

The 2018 Capital Bank Loan is a ten-year obligation with a balloon payment at maturity, replacing the 2017 Capital Bank Loan, which had an initial term of six months. There is a "strong presumption that a time extension on a senior mortgage" alone does not materially prejudice junior interests. Restatement, cmt. b. A typical junior lienor has no ability to affect or impact a senior lienor's decision to extend the term of their obligation. Restatement, cmt. b. In order for an extension of time to be materially prejudicial, such extension must place the junior interest in a "substantially weaker position." Restatement, cmt. b. The 2017 Capital Bank Loan provided for extensions by agreement without limitation (i.e., the 2017 Capital Bank Loan was eligible for any number of extensions, including through ten years), thus there is no evidence in this case that overcomes the presumption that an extension on the term of the 2017 Capital Bank Loan did not prejudice Cornerstone.[8]

    *iv)*    *Type of Loan*

A similar analysis as to the term of loan applies to the change in the type of loan from one requiring principal and interest payments to an interest-only loan with a balloon payment at maturity. As noted in the Restatement, mortgagees commonly consent to an extension of maturity date or extending installment payments, and absent a corresponding increase in interest rate or principal, such modifications do not materially jeopardize junior lienholders. Restatement, cmt. b,

---

[8] Given the hefty fees and costs charged by Cornerstone for each of its relatively short extensions to the Potomac Entities, it is equally plausible to infer that a single extension to ten years was also to the benefit of junior lienors due to lower potential fees and costs associated with a single extension compared to multiple extensions and corresponding extension fees.

c. As such, there is no material prejudice to Cornerstone as a result of the change in the type of loan.

> v)      *Other Considerations*

If the Court were to hold that the doctrine of replacement of mortgages does not apply, Cornerstone would receive a windfall. Like equitable subordination, the purpose of the doctrine of replacement of mortgages is to ensure that the junior lienholder does not receive a windfall. *Smith v. First Am. Title Ins. Co. (In re Stevenson)*, 789 F.3d 197, 201 (D.C. 2015); Restatement, cmt. b. Cornerstone received a $394,948.58 paydown of its Lien from the Net Proceeds as part of the 2018 Transaction, resulting not in a detriment from the 2018 Capital Bank Refinance, but a benefit. Stated otherwise, Cornerstone's position at closing of the 2018 Capital Bank Refinance improved by receipt of a payment of almost half of its outstanding balance at the time. If Cornerstone is not subrogated to Capital Bank, the result would be a substantial payment and increased priority without any consideration—a clear windfall.

This conclusion is supported by the comments to the Restatement, which instruct that the Court should not infer any intent by Capital Bank to subordinate to Cornerstone in the absence of a clear statement or other proof to the effect. *See* Restatement, cmt. b. The instruction to not infer intent applies even in situation such as this, where the senior mortgagee had actual knowledge of a junior lien at the time the replacement. Restatement, cmt. b. As stated *supra* in section II.b., the Court finds that there is no clear statement or other proof that Capital Bank intended anything other than for its lien to retain a first position. Therefore, the Court hereby finds that Capital Bank is entitled to a first priority position on the Property in the amount of $1,583,473.95 plus 5 percent interest under the doctrine of replacement of mortgages. Because the Court grants relief under the

doctrine of replacement of mortgages, it does not reach Capital Bank's third alternative form of relief.

### d) Capital Bank is Not Barred from Relief by the Doctrine of Laches

Cornerstone asserts that notwithstanding the Court's finding that Capital Bank is entitled to relief under the doctrine of replacement of mortgages, Capital Bank is barred from recovery by the equitable defense of laches. Pl's Post Hr'g Br. at 2, ECF No. 92. The party invoking laches has the burden of proving undue and unexcused delay resulting in prejudice to the party raising the laches defense. *See, e.g.*, *Schmittinger v. Schmittinger*, 404 A.2d 967, 970 (D.C. 1979) ("The elements of laches, therefore, are (1) undue delay, (2) unexplained delay, and (3) injustice to the other party."). A party invoking a claim of laches must prove "that the party against whom laches is imputed has knowledge of his [or her] rights, and an ample opportunity to establish them in a proper forum." *American University Park Citizens Ass'n v. Burka*, 400 A.2d 737, 742 (D.C. 1979) (quoting *Galliher v. Cadwell*, 145 U.S. 368, 372 (1892) (internal quotation marks omitted)).

In this case Cornerstone alleges that Capital Bank should have been aware of its second position after completion of the 2018 Transaction, despite receipt of the Title Policy. In essence, Cornerstone alleges that a party utilizing a title company to close a transaction nevertheless has an independent duty to review and confirm the completion of the transaction as reflected in the title policy. The Court finds that there is no such duty under the applicable laws. *See, e.g.*, *Long v. American Sav. & Loan Ass'n*, 151 A. 2d 770, 774 (D.C. 1959) ("To impose liability on defendant for the mistakes of the title company … would in effect make defendant an insurer of the work performed by those engaged in the highly specialized task of searching titles."). As Cornerstone's own expert conceded, a settlement agent represents the transaction, not necessarily the individual parties. Tr. Hr'g Feb. 7, 2023 at 166:2. In support of its position, Cornerstone points to the case of

*Wagman v. Lee*, 457 A.2d 401 (D.C. 1983) where the court held that the escrow agent was a "dual agent of both parties" until they perform the conditions of the escrow agreement, at which point the escrow holder "becomes the agent of the purchaser as to the deed and of the seller as to the money." *See* Def.'s Post Hr'g Br. at 13, ECF No. 94 (quoting *Wagman*, 457 A.2d at 404 (internal citation omitted)). However, in this case, the title (escrow) agent did not perform all the conditions of his agreement (either by negligence or otherwise), and thus the *Wagman* analysis is inapplicable. Therefore, the Court declines to impute knowledge to Capital Bank as a result of the 2018 Transaction.

Capital Bank first learned that Cornerstone was claiming first lien position in December 2020 when it received a notice of Cornerstone's intent to foreclose. Tr. Hr'g Feb. 7, 2023 at 120:15. In less than a month, on January 5, 2021, Capital Bank filed the Superior Court case to have the priority of liens on the Property determined. Stated otherwise, as soon as Capital Bank was aware of the issue, it immediately took actions to establish its rights in the appropriate forum. There is no allegation that the time between notice of the foreclosure and the filing of the Superior Court case involved an undue or unexplained delay. Thus, once again, the Court's determination turns to the injustice on the other party.

In considering whether laches applies, injustice is determined based upon the applicable delay after knowledge, not the events prior to the parties' knowledge. *See Szuch v. Lewis*, 193 F. Supp. 831, 835 (D.D.C. 1960) ("Mere passage of time does not constitute laches. The doctrine of laches is the principle that equity will not aid a plaintiff whose *inexcusable* delay if the suit were allowed would be prejudicial to the defendant." (internal citations omitted, emphasis added)). At Trial, Cornerstone introduced evidence in support of injustice as a result of the delay between the completion of the 2018 Capital Bank Refinance and the filing of the Superior Court action.

However, no evidence was introduced as to injustice as a result of the time between notice of the foreclosure (and thus, discovery of the lien issue) and the filing of the Superior Court case. The timeline implies the exact opposite—instead of delaying on their rights, Capital Bank acted promptly upon discovery of the situation. Therefore, Capital Bank is not barred from recovery under the doctrine of replacement of mortgages by laches.

### IV.    Conclusion

For the reasons stated, the Court finds that Capital Bank is entitled to a declaratory judgment that it holds a valid and secured first lien on the Property for the principal amount of $1,583,473.95 plus 5 percent interest from April 18, 2018. Capital Bank's request for a declaratory judgment as to the balance of the 2018 Capital Bank Loan is denied with such balance maintaining a valid and secured second lien on the Property.

Separate judgment order to follow.

[Signed and dated above.]

Copies to: recipients of electronic notifications.